EXHIBIT 1

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court
### EASTERN DISTRICT OF VIRGINIA

FILED
DEC 15 2004
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

AMERICA ONLINE, INC
22000 AOL Way
Dulles, Virginia 20166

**CRIMINAL COMPLAINT**

CASE NUMBER: 1:04 M 1133

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about September 2000 and continuing until in or about June 2001, in Loudoun County, in the Eastern District of Virginia defendant(s) did, (Track Statutory Language of Offense) knowingly, intentionally and unlawfully aid and abet a violation of the Federal Securities laws, in violation of Title 18, United States Code, Section 2; Title 15, United States Code, Sections 78j and 78ff(a); and Title 17, Code of Federal Regulations, Section 240.10b-5.

I further state that I am a(n) Special Agent of the FBI and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

AUSA- Charles F. Connolly

Sworn to before me and subscribed in my presence,

Signature of Complainant
Robert Core
Special Agent
FBI

December 15, 2004 at Alexandria, Virginia
Date                                        City and State
BARRY R. PORETZ
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer         Signature of Judicial Officer

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:04 M 1133 |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Robert T. Core, being duly sworn, deposes and states as follows:

1.  I am a Special Agent of the Federal Bureau of Investigation, assigned to the Northern Virginia Resident Agency of the Washington Field Office. I have been employed as a Special Agent for more than twenty-five years and have been a licensed attorney for more than twenty-six years. I have been charged with investigating criminal white collar offenses involving fraud exclusively since 1989. I have been assigned to the investigation of the instant matter since July 26, 2002.

2.  Attached hereto and incorporated herein as Appendix A is a Statement of Facts, setting forth information obtained in the course of investigation through interviews of individuals, examination of documentary records, and examination of financial records. The facts and information contained in the Statement of Facts are based upon my personal knowledge, as well as the observations of other agents and officers involved in this investigation.

3.  The Statement of Facts contains information necessary to support probable cause for a criminal complaint. It is not intended to include each and every fact and matter observed by me or known to the government.

1

4.  Based on the facts contained in the Statement of Facts, I respectfully submit that there is probable cause to believe that AOL, acting through its officers and employees, did commit, in the Eastern District of Virginia and elsewhere, a violation of federal law, that is, aiding and abetting a violation of federal securities laws, Title 18, United States Code, Section 2; Title 15 United States Code, sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

The above information is true and correct to the best of my knowledge, information and belief.

_____
Robert T. Core, Special Agent,
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO
BEFORE ME IN MY PRESENCE
THIS WEDNESDAY, DECEMBER 15, 2004

_____
United States Magistrate Judge
Eastern District of Virginia

2

APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 1:04 M 1133 |
| ) | |
| AMERICA ONLINE, INC., ) | |
| ) | |
| Defendant. ) | |

STATEMENT OF FACTS

A.   **AOL and Time Warner**

1.  Prior to on or about January 11, 2001, America Online, Inc. (hereinafter "AOL"), was a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in Dulles, Virginia in the Eastern District of Virginia. AOL was a leader in interactive services, web brands, Internet technologies, and electronic commerce services, and engaged in the sale of, among other things, Internet subscriptions and advertising.

2.  On or about September 13, 2000, AOL launched its Netscape NetBusiness platform, which was designed to be an Internet site dedicated to providing interactive services to the small business community.

3.  On or about January 11, 2001, AOL and Time Warner Inc. consummated a merger. Following the merger, AOL operated as a separate division and wholly-owned subsidiary of the combined company, which was named AOL Time Warner Inc.

4.  On or about October 16, 2003, AOL Time Warner Inc. changed its name to Time

1

Warner Inc. (hereinafter "TWI"). TWI is a publicly-owned corporation organized and existing under the laws of the State of Delaware and based in New York, New York. Among other things, TWI engages in the sale of broadcast and print media products.

5. Prior to on or about January 11, 2001, the common stock of TWI and AOL was publicly traded on the New York Stock Exchange. After the merger, the common stock of TWI continued to be publicly traded on the New York Stock Exchange, and was bought and sold by individuals and entities throughout the United States, including the Eastern District of Virginia.

6. AOL's Business Affairs and Interactive Marketing groups were primarily responsible for negotiating contracts, advertising deals and marketing arrangements with customers.

**B.    PurchasePro.com**

7. PurchasePro.com, Inc. ("PurchasePro") was a publicly-owned corporation duly organized and existing under the laws of the State of Nevada and based in Las Vegas, Nevada. The common stock of PurchasePro was publicly traded on the National Market of the National Association of Securities Dealers Automated Quotations System ("NASDAQ"). PurchasePro's common stock was bought and sold by individuals and entities throughout the United States including the Eastern District of Virginia. Among other things, PurchasePro engaged in the sale of Internet procurement software and services.

8. By the third quarter of 2000 and continuing through 2001, PurchasePro's principal product was a form of Internet software known as a "marketplace license" used for business-to-business or "B2B" commerce. As promoted by PurchasePro, the marketplace license allowed small and large businesses to buy and sell products on the Internet in a cost-

efficient manner.

9. In addition to its marketplace licenses, PurchasePro also sold re-seller marketplace licenses, preferred supplier agreements, hosting and maintenance services and "bulk" subscriptions.

**C.  Securities Regulation**

10. The Securities and Exchange Commission ("SEC") was an agency of the United States responsible for the review of financial statements and reports of the issuers of securities. The SEC relies on the accuracy and truthfulness of the reports filed with it.

11. As publicly-traded companies, TWI, AOL and PurchasePro and their directors, officers and employees were required to comply with the federal securities laws and regulations. Those laws and regulations were designed to ensure that the financial information of publicly-traded companies was accurately recorded and disclosed to the investing public.

12. Under the federal securities laws and regulations, TWI, AOL and PurchasePro were required, among other things: (a) to make and keep books, records and accounts that accurately and fairly reflected the business transactions of the respective companies; (b) to file with the SEC quarterly reports (known as a SEC Form 10-Q), annual reports (known as a SEC Form 10-K) and other periodic reports that included accurate and reliable financial statements prepared in accordance with Generally Accepted Accounting Principals ("GAAP").

13. TWI, AOL and PurchasePro were required to retain outside public auditors to review, audit and test their respective financial statements for compliance with appropriate accounting rules.

### D. The AOL-PurchasePro Strategic Partnership

14. On or about March 15, 2000, PurchasePro and AOL entered into a series of contractual agreements, including the Interactive Marketing Agreement ("IMA"), the Technology Development Agreement ("TDA") and the Warrant Agreement. The IMA obligated PurchasePro to pay AOL $50 million in cash; $25 million upon signing and $3.57 million each quarter for seven consecutive quarters ending December 2001. The TDA obligated PurchasePro to pay AOL a total of $20 million in increments of $2.5 million per quarter beginning in or about August 2000. These payments were intended to reimburse AOL for the development costs associated with building AOL's internet platform. The Warrant Agreement provided AOL with 500,000 PurchasePro warrants and allowed AOL to earn up to 1,500,000 performance warrants based upon certain criteria and PurchasePro revenue thresholds.

15. The agreements were intended to create a strategic partnership between AOL and PurchasePro in which the companies would co-develop a business-to-business global marketplace on AOL's Netscape NetBusiness service.

16. As of the close of the third quarter of 2000, PurchasePro had not met any of the revenue thresholds established by the Warrant Agreement and AOL had not earned any performance warrants.

17. On or about December 29, 2000, AOL and PurchasePro amended the Warrant Agreement to modify the criteria and revenue thresholds necessary for AOL to earn the performance warrants. The parties made the Amendment effective as of November 18, 2000. The amended Warrant Agreement also accounted for the intervening 2-for-1 split of PurchasePro's common stock. Therefore, AOL could earn up to 3 million performance warrants.

4

The value of the warrants that AOL could earn was capped at $30 million for the fourth quarter of 2000, $45 million for the first quarter of 2001 and $60 million for the second quarter of 2001. The value was to be determined by an agreed-upon formula that allowed AOL to earn warrants with a value of $3 for each dollar of revenue PurchasePro recognized as a result of a third party revenue referred to PurchasePro by AOL. In short, AOL earned $3 in warrants for each $1 of revenue it referred to PurchasePro.

E. **AOL Officers and Employees Aided and Abetted PurchasePro's Fraud**

18. From in or about September 2000 to in or about June 2001, in the Eastern District of Virginia and elsewhere, six or more AOL officers and employees, in exchange for increased revenue to AOL in the fourth quarter of 2000 and the first quarter of 2001, aided and abetted PurchasePro officers' false and fraudulent inflation of PurchasePro's revenues as reported to the investing public in the fourth quarter of 2000 and the first quarter of 2001.

**Third Quarter of 2000**

19. In or about September 2000, a Business Affairs employee agreed on behalf of AOL to purchase ten re-seller marketplace licenses from PurchasePro for a total cost of $2 million in an effort to help PurchasePro exceed analyst estimates for third quarter 2000 revenue and in exchange for PurchasePro's agreement to amend the Warrant Agreement. AOL purchased these re-seller marketplace licenses without having a need for them and without any intention of using the licenses.

20. On or about October 11, 2000, the same Business Affairs employee, on behalf of AOL, falsely confirmed in writing to PurchasePro's outside auditors that there were "no other contracts or agreements as to terms, whether written or oral, between PurchasePro and AOL that

5

relate" to the purchase of $2 million re-seller marketplace licenses when in fact the employee knew that the re-seller licenses were bought in exchange for the promise to amend the warrant agreement in the future.

**Fourth Quarter of 2000**

21. In or about December 2000, at least two Business Affairs employees agreed on behalf of AOL to purchase approximately $10 million of products from PurchasePro in exchange for PurchasePro's agreement to grant AOL $30 million worth of PurchasePro warrants. To fulfill this agreement, on or about December 21, 2000, AOL entered into a Bulk Subscription Sales Agreement that required AOL to purchase from PurchasePro approximately 100,000 Promotional Subscriptions at $49 each for a total of $4.9 million. AOL also purchased 5 marketplace licenses for a total of approximately $4.6 million.

22. On or about December 21, 2000, PurchasePro senior officers, with the assistance and knowledge of AOL officers and employees, sent a letter to AOL indicating that PurchasePro had earned over $10 million in recognizable revenue in the fourth quarter of 2000 and therefore that AOL had earned warrants valued at $30 million.

23. AOL officers and employees learned, however, that PurchasePro's outside auditors would require PurchasePro to net any revenue received directly from AOL against the $30 million in warrants. Simply put, AOL officers and employees learned that the exchange of approximately $10 million in direct purchases for the $30 million in warrants would result in no recognizable revenue for PurchasePro. Therefore, AOL officers and employees assisted PurchasePro officers in concealing the true nature of the agreement from PurchasePro's outside auditors, by doing the following:

6

a. In or about the fourth quarter of 2000, a Business Affairs employee and an Interactive Marketing employee, on behalf of AOL, signed referral forms falsely indicating that AOL had referred a number of companies that purchased marketplace licenses from PurchasePro in the fourth quarter 2000;

b. On or about February 7, 2001, a Business Affairs employee caused another Business Affairs employee to execute a letter that purported to "clarify ambiguities" in the Amended Warrant Agreement by stating that AOL could not earn warrants as a result of revenue resulting from products sold directly from PurchasePro to AOL; and

c. On or about February 8, 2001 a Business Affairs employee signed a letter to PurchasePro's auditors that falsely stated that there were no additional written or oral agreements relating to the revenues resulting from AOL's purchase of marketplace licenses for approximately $4.6 million in the fourth quarter of 2000, when in fact that employee knew that the $4.6 million purchase was part of the exchange for the $30 million in warrants.

24. On April 2, 2001, PurchasePro filed its annual report on Form 10-K for fiscal year ending December 31, 2000, falsely reporting annual revenues of approximately $65 million and revenues for the fourth quarter of 2000 of approximately $33.59 million. The Form 10-K also falsely stated that AOL referred $10.5 million of revenue to PurchasePro. The Form 10-K was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

7

**First Quarter of 2001**

25. In the first quarter of 2001, two Business Affairs employees and an Interactive Marketing employee agreed to assist PurchasePro in selling marketplace licenses to AOL's customers and partners through the use of undocumented guarantees, oral promises, or other propositions designed to ensure that the purchaser would not suffer any net financial loss as a result of the marketplace license purchase. AOL officers and employees agreed to reach secret side agreements with license purchasers or commit to "sweeteners" that included, among other things: (i) promises to reduce by a specified dollar value future payments the marketplace license purchasers already were contractually obligated to pay AOL; (ii) promises to provide a specified dollar value worth of on-line advertisements or carriage on AOL's Internet properties; (iii) promises by AOL to buy more products from its suppliers; (iv) promises by AOL to buy its products from suppliers at a higher price; or (v) combinations of two or more such promises.

26. AOL had an economic incentive to help sell PurchasePro marketplace licenses in the first quarter of 2001 because PurchasePro promised to give AOL, among other things: (i) a 50% commission for each marketplace license that AOL sold on PurchasePro's behalf; and (ii) $3.00 worth of PurchasePro warrants under the amended Warrant Agreement for each $1.00 of referred revenue recognized by PurchasePro in the first quarter of 2001.

27. During the final weeks of the first quarter of 2001, AOL employees made oral promises to numerous customers or partners in order to induce the customer's or partner's purchases of marketplace licenses. These undocumented promises and agreements resulted in at least nine marketplace license sales by PurchasePro in the first quarter of 2001 for a total of approximately $8.1 million.

8

28. During the final weeks of the first quarter of 2001 and continuing after the close of the first quarter into April 2001, two Business Affairs employees pursued ways to further assist PurchasePro with its quarterly revenue numbers and eventually agreed to an Amendment to the Bulk Subscriptions Agreement. Pursuant to the Amendment, AOL agreed to once again purchase bulk subscriptions from PurchasePro for AOL's Netbusiness customers. At or about the close of the first quarter of 2001, these employees agreed on behalf of AOL to purchase subscriptions covering January, February and March 2001 for a total of approximately $9 million. AOL's NetBusiness users, however, were not made aware of these free subscriptions to the PurchasePro marketplace until late March 2001.

29. In or about the last days of March 2001, a Business Affairs employee agreed to further assist PurchasePro's efforts to meet its first quarter revenue estimates by agreeing that AOL would pay PurchasePro approximately $3.65 million for integration work allegedly performed by PurchasePro in the first quarter of 2001. On or about Saturday, March 31, 2001, a NetBusiness employee assisted PurchasePro employees in this endeavor by providing PurchasePro with language for the contract, called a Statement of Work, formalizing this agreement. AOL employees knew that the work necessary to support AOL's payment of approximately $3.65 million to PurchasePro had not been completed in the first quarter of 2001. Indeed, AOL employees were aware that PurchasePro employees were still drafting the Statement of Work, which defined the work necessary for the integration and the $3.65 million payment, during the first week of April 2001.

30. Nevertheless, a NetBusiness employee falsely confirmed to PurchasePro's outside auditors that the work had been completed. Subsequently, a second NetBusiness employee

signed a confirmation letter on behalf of AOL for PurchasePro's outside auditors that falsely stated, among other things, "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."

31. On or about April 24, 2001, a NetBusiness employee participated in a telephone conference call with one of PurchasePro's outside auditors and again falsely confirmed that the integration work under the Statement of Work had been completed by March 31, 2001.

32. At the close of the first quarter of 2001, PurchasePro issued warrants to AOL under the amended Warrant Agreement that were valued at approximately $7.7 million. This warrant revenue, which was recognized by AOL, was based entirely on the sale of one marketplace license for $3.7 million to a customer allegedly referred to PurchasePro by AOL. In fact, AOL did not refer the customer. Nevertheless, a Vice President in Interactive Marketing signed, on behalf of AOL, a referral form falsely representing that AOL had referred the purchaser.

33. On or about March 31, 2001, two Business Affairs employees and an Interactive Marketing employee demanded that PurchasePro pay AOL $12.2 million as payment for commissions allegedly earned by AOL from its first quarter 2001 marketplace license sales campaign. In fact, the two Business Affairs employees and the Interactive Marketing employee knew that AOL had not earned the full $12.2 million in commissions but had earned only about $6.7 million in commissions, and much of that was from undocumented and undisclosed side deals. But the AOL officers and employees knew that in order to recognize all $12.2 million in commission revenue in the first quarter of 2001, the check had to be received by midnight on March 31, 2001. Therefore, a senior executive at PurchasePro personally delivered to AOL a

10

hand written check for $12.2 million.

34. As of the close of the first quarter of 2001, PurchasePro was well short of meeting its revenue estimates. Knowing that PurchasePro's officers were "keeping the quarter open" in an effort to close the gap, and in order to "earn" the $12.2 million in first quarter commissions for which AOL had already been paid, at least two Business Affairs employees agreed to continue to sell PurchasePro marketplace licenses to AOL customers and partners. To disguise the efforts to sell marketplace licenses after the close of the quarter, an AOL employee facilitated the back-dating of the contracts to make it appear that the contracts were signed by the close of the first quarter of 2001. These efforts resulted in at least two additional marketplace license sales with a total value of approximately $6.7 million being back-dated into the first quarter of 2001.

35. On or about April 5, 2001, at least two Business Affairs employees and a Senior Vice President within Business Affairs, on behalf of AOL, executed or caused to be executed the Amended Bulk Subscription Agreement dated "as of March 31, 2001" that required AOL to pay PurchasePro a total of approximately $9 million for bulk subscriptions in January, February and March 2001.

36. On or about April 18, 2001, a NetBusiness employee wrote an e-mail to another AOL employee discussing the efforts to justify the $9 million Amended Bulk Subscriptions Agreement. The e-mail stated in part: "This is the scoop. During the week of 4/5 [two Business Affairs employees] had to make [PurchasePro senior executive] whole to help him make his numbers. [$]9M[illion] in subscriptions was something [AOL employees] put together because we couldn't sell enough marketplaces despite best efforts."

11

37. On April 26, 2001, PurchasePro publicly announced that it had earned approximately $29.8 million in revenue for the quarter ended March 31, 2001.

38. On May 29, 2001, PurchasePro filed its quarterly report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million. The Form 10-Q was filed electronically with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

F. **Conclusion**

39. As a result of the actions of its officers and employees, AOL aided and abetted PurchasePro's officers in reporting at least $10 million – or approximately 1/3 of the quarterly revenue included in the From 10-K – in false revenue in the fourth quarter of 2000 and at least $20 million – or nearly 2/3 of the total revenue publicly announced on April 26, 2001 – in false revenue in the first quarter of 2001.

40. As a result of aiding and abetting PurchasePro's officers' fraud, AOL was able to report approximately $20 million of additional revenue from PurchasePro in the Fourth Quarter of 2000 and approximately $15 million of additional revenue in the first quarter of 2001.

41. AOL acknowledges that venue is proper in the Eastern District of Virginia and waives any objection to venue in the Eastern District of Virginia as well as any objection to this Court's exercising jurisdiction in this matter.


There are other matters and facts known to the parties that are not included in this Statement of Facts.